# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| In re: | |
|---|---|
| ON-SITE SOURCING, INC., | Case No. 09-10816-RGM<br>(Chapter 11) |
| Debtor. | |

## MEMORANDUM OPINION

The issue before the court is the extent to which a chapter 11 debtor may substitute a §363 sale for a chapter 11 plan. The debtor reached too far in this case. While the sale will be approved, those portions that are a substitute for a chapter 11 plan will be excised. This memorandum opinion supplements the oral ruling of the court disallowing the proposed unsecured creditors trust. In order to fully appreciate the §363 sale proposal, it is necessary examine the debtor's pre-petition sales efforts, the debtor's pre-petition debt structure and the debtor-in-possession's post-petition financing.

### Background

Pre-Petition Sales Efforts

On-Site Sourcing, Inc.,[1] filed a voluntary petition in bankruptcy pursuant to chapter 11 of the Untied States Bankruptcy Code on February 4, 2009, at 8:53 p.m. Over the next five hours the debtor filed twelve additional pleadings. The one at issue, a motion to approve auction procedures and the sale of substantially all of the debtor's assets (Docket Entry 10), was filed just after midnight,

---

[1] Two related entities also filed petitions. All three debtors are being jointly administered.

at 12:47 a.m., on February 5, 2009.[2]  That morning, the court granted the debtor's motion for an expedited hearing on its first day motions which included the motion to approve the auction procedures and the sale of substantially all of the debtor's assets.  The hearing was set for the following day, February 6, 2009.

It was immediately obvious from the papers filed in the case and the statements of counsel in court that this case was filed to facilitate Integreon Discovery Solutions (DC), Inc.'s purchase of substantially all of the debtor's assets.  It appears that nothing would have prevented a non-bankruptcy UCC sale but the parties sought a §363 sale instead.  The essence of the case and the events leading to the filing of the petition are captured in the debtor's sale motion.  The debtor stated:

> 8. By 2008, the Debtors could no longer service their secured debt and entered into several forbearance agreements and amended credit facilities to negotiate revised repayment terms. In late 2008, still significantly leveraged and facing continued revenue decreases, the Debtors were facing liquidation.  As part of a final offer to their secured lenders, the Debtors, along with their advisors, solicited potential purchasers of the business.  After speaking to a number of potential buyers, both strategic and financial, as well as investment bankers and business brokers, the Debtors engaged in further discussions with six interested parties (the "Other Interested Parties"). These marketing efforts resulted in a competitor, Integreon Managed Solutions, Inc., agreeing to assume the role of the Debtors' secured lenders and negotiate the possible sale of the business.  The secured debt (in a principal amount of approximately $35,000,000) was assigned to Integreon by the Debtors' former secured lenders in early 2009.  The bankruptcy case was filed in order to pursue the highest and best offer for the sale of the Debtors' business operations.

---

[2]The breadth of the motion is captured, in part, by its title: "Motion of the Debtors for Entry of Orders (I) (A) Establishing Bid Procedures Related to the Sale of Substantially All of the Debtors' Assets, (B) Scheduling a Hearing to Consider the Sale, (C) Approving the Form and Manner of Notice of Sale by Auction, (D) Establishing Procedures for Noticing and Determining Cure Amounts and (E) Granting Related Relief; and (II) (1) Approving Asset Purchase Agreement and Authorizing the Sale Free and Clear of All Liens, Claims, Encumbrances and Interests, (2) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (3) Granting Related Relief."

> 9. Ultimately, the Debtors' discussions and negotiations with Integreon prior to and after the assignment of the Debtors' secured debt to Integreon resulted in the proposed asset purchase agreement (the "APA") described herein. Based on the Debtors' consultations with its financial advisors and other relevant considerations, the Debtors believe that it is in the best interest of the Debtors, their estates, creditors and other stakeholders to enter into the APA. In particular, the APA or a similar transaction would allow a significant portion of the Debtors' business to continue operations as a going concern thereby maintaining the important services the Debtors provide to their customers and, most importantly, preserving many of the jobs of the employees of the Debtors.

Motion of the Debtors for Entry of Orders (I) (A) Establishing Bid Procedures Related to the Sale of Substantially All of the Debtors' Assets, (B) Scheduling a Hearing to Consider the Sale, (C) Approving the Form and Manner of Notice of Sale by Auction, (D) Establishing Procedures for Noticing and Determining Cure Amounts and (E) Granting Related Relief; and (II) (1) Approving Asset Purchase Agreement and Authorizing the Sale Free and Clear of All Liens, Claims, Encumbrances and Interests, (2) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (3) Granting Related Relief at ¶¶8-9. ("Sale Motion") (Docket Entry 10).

The debtor clarified and disclosed that the secured debt was originally assigned to Integreon Managed Solutions, Inc. which then assigned it to its wholly-owned subsidiary, Integreon Discovery Solutions (DC), Inc. Sale Motion at ¶8 n.3. The latter entity is referred to as Integreon in this opinion.

The debtor's debt structure was a bit more complicated. There was subordinated debt and intracreditor subordination agreements. Integreon resolved this complication by acquiring the subordinated debt as well as the bank loan. *See* Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364(c), 364(d) and 364(e) and Fed.R.Bankr.P. 4001 and 9014 (I) Authorizing Debtors to Obtain Secured Postpetition Financing on Super-Priority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Cash Collateral of Existing Secured Lender, (III) Granting Adequate Protection to Prepetition Secured Party, (IV)

Authorizing Debtors to Repay Existing Secured Indebtedness upon Final Approval and (V) Setting the Time for the Final Hearing at ¶9-12. ("DIP Financing Motion") (Docket Entry 11).

### DIP Financing Motion

One of the first day motions was a debtor-in-possession financing motion. (Docket Entry 11). Not surprisingly, the proposed DIP lender was Integreon. Integreon was the sole pre-petition secured creditor. The debt, while secured by a lien on almost all of the debtor's assets, was significantly undersecured. The debt was about $35 million, but Integreon proposed to pay and the debtor proposed to accept $28 million for substantially all of the debtor's assets as a going concern. As the sole secured creditor with a lien on assets worth less than its debt, it controlled the debtor's ability to obtain financing from any other source, assuming that in the then challenged environment there was another source. As the prospective purchaser of the debtor's assets as a going concern, it was in Integreon's best interests to assure that the debtor continued in operation. And that required post-petition funding.

The proposed DIP loan contained many provisions generally frowned upon and frequently rejected by most bankruptcy courts. Integreon proposed to loan the debtor $40 million even though the debtor only needed about $1 million, less receipts, to operate during the pendency of the sale of substantially all of its assets to Integreon, a period that was intended to be 30 to 60 days. The proposed loan term capped this period at 90 days. The $40 million was to be used to pay-off Integreon's pre-petition secured debt and replace it with post-petition debt. The provision would have promoted Integreon's pre-petition $7 million unsecured portion of its debt to an administrative

claim.[3] In addition, Integreon was to be paid a lending fee of 0.75%, or $300,000, on the $40 million loan. It was to have a lien on all assets of the debtor, including all recoveries under chapter 5 of the Bankruptcy Code. It was to have priority and super-priority liens on all collateral over all other liens and claims under §364(d). All obligations under the DIP loan were to be allowed administrative expense claims with a priority under §364(c)(1) over any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, §§105, 326, 328, 503(b), 507(a), 507(b) and 726. The effect of the proposed DIP loan was to foreclose the possibility of any other creditor receiving any distribution from the debtor, including all administrative claimants.

Certain administrative claimants were protected by proposed carve-outs. Integreon agreed that court fees, the United States Trustee's fees, fees incurred by a chapter 7 trustee not to exceed $50,000, a premium on directors and officers tail insurance not to exceed $30,000, and certain professional fees not to exceed $50,000 after a carve-out trigger notice would be carved-out from its lien and administrative claim.

The remedy in the event of a default under the proposed DIP loan, including the maturity of the loan in 90 days, was immediate and assured. The automatic stay would immediately terminate

---

[3] Bankruptcy Code §506(a)(1) provides that an allowed secured claim is a secured claim only to the extent of the value of collateral and is an unsecured claim as to the balance. The DIP Financing Motion requested, in addition to a blanket lien on all of the debtor's assets, Bankruptcy Code §364(c) protection which would also make Integreon's DIP loan an administrative claim with priority over any and all administrative expenses provided in §§503(b) and 507(b). This protection is important only if a DIP loan is not fully covered by the proposed collateral. Here, the "new" post-petition loan is clearly as undersecured as the "old" pre-petition loan. The effect would be to convert the pre-petition unsecured loan into a post-petition superpriority administrative claim. If the other unsecured creditors had even a glimmer of hope of receiving any distribution before the proposed DIP loan, they certainly had none under the proposed DIP loan. Integreon's pre-petition unsecured claim would be paid ahead of them as a post-petition superpriority administrative claim.

5

without further order of the court and Integreon could immediately utilize its remedies under the DIP loan documents.

## The Sale Motion

The Sale Motion was filed with the petition and the DIP Financing Motion. The debtor and Integreon sought a prompt sale which would have effectively prevented any individual creditor from undertaking any meaningful review and analysis of the proposed sale. The sale did not proceed as quickly as anticipated, however, and the Unsecured Creditors Committee was able to become involved.[4]

The terms of the proposed sale benefitted Integreon and could have, had there been any other realistic interest, chilled the bidding. The Sale Motion proposed a break-up fee to Integreon of $560,000 plus additional expenses not to exceed $250,000.[5] Integreon's initial bid was to be $28,000,000. The minimum bid for any qualified bidder was $28,810,000 so that the break-up fee and expenses would be covered if there were another successful bidder. Thereafter, the bidding increment was $500,000. The sale was to be free and clear of all interests and claims.

---

[4] The Unsecured Creditors Committee requested a Rule 2004 examination of Integreon which both Integreon and the debtor opposed. The examination was never authorized but the parties appear to have cooperated enough to satisfy the Unsecured Creditors Committee's informational requests.

[5] Break-up fees can serve a useful purpose in bankruptcy auctions. But merely reciting the theoretical benefits in a motion does not insure that they inure to the benefit of the estate. One frequently proffered benefit is that the break-up fee encourages a reluctant prospective bidder to perform its due diligence and make the first bid, thereby opening a vigorous auction. If it is not the successful bidder, it is compensated for its efforts and reimbursed for its expenses, the compensation being justified by opening the auction in circumstances where there may have been no other reasonable bid. This is not the situation in this case. Integreon made its decision to purchase On-Site's electronic discovery business when it purchased the bank's note and the subordinated debt. It committed to the acquisition at that moment. It needed no other incentive to open the bidding. Indeed, it appears to have actively cooperated with the debtor in filing the case and seeking a quick §363 sale. The break-up fee purchased nothing in this case.

Modifications to the Proposed Sale Obtained by Unsecured Creditors Committee

The Unsecured Creditors Committee ultimately supported the sale on modified terms. The proposed modifications provided that Integreon would forgive its deficiency claim; that certain assets would be excluded from the sale, specifically, tax refunds and chapter 5 causes of action against officers and directors (except three key employees that Integreon intended to retain) and 35% of all other chapter 5 causes of action. The pre-sale budget line for the Committee's attorneys was increased from $115,000 to $225,000, which Integreon agreed to pay. In addition, a general unsecured creditors trust was to be established. Integreon agreed to fund the trust with a lump sum payment of $132,500, a one-half interest in all tax refunds and the immediate payment of the Committee's professional's carve-out.

The United States Trustee objected to some of the proposed modifications. The sale was approved without the general unsecured creditors trust and without the releases for the three key employees. The funds that Integreon was to have paid to the trust were paid to the debtor.

No plan of reorganization has been filed. It appears from the comments of counsel that a plan, if it is filed, will be a liquidating plan and that there are no significant assets remaining to be liquidated after the consummation of the sale to Integreon.

## Discussion

The difficulty with this case is not the decision to sell the debtor's assets in bankruptcy rather than through a non-bankruptcy UCC sale or the skill of the attorneys in identifying their client's interests and endeavoring to maximize them, but in recognizing the proper line between sales under §363 before the confirmation of a chapter 11 plan and sales under §1123(a)(5)(D) after confirmation

of a chapter 11 plan. There are substantial differences in the procedures between the two sale methods and the creditor protections available. They are concisely stated in *In re Gulf Coast Oil Corp.*:

> A § 363(b) sale is generally viewed as quicker. Only a motion and a hearing are required, and most courts apply a "business judgment test" to determine whether to approve the sale. By contrast, confirmation of a chapter 11 plan usually involves (i) preparation, court approval, and distribution of a disclosure statement, (ii) voting by creditors to accept or to reject the plan, and (iii) determination by the Court of whether the plan meets statutory confirmation standards.

*In re Gulf Coast Oil Corp.,* 404 B.R. 407, 415 (Bankr.S.D.Tex. 2009) (footnotes omitted).

This issue is not new. An early and still important case under the Bankruptcy Code of 1978 is *Committee of Equity Security Holders v. The Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2nd Cir. 1983). There the Court of Appeals reversed an order authorizing a pre-confirmation §363(b) sale while expressly recognizing the authority of the bankruptcy court to authorize pre-confirmation §363(b) sales in proper circumstances. The Court of Appeals concluded that:

> The history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b). . . .
>
> Resolving the apparent conflict between Chapter 11 and §363(b) does not require an all or nothing approach. Every sale under §363(b) does not automatically short-circuit or side-step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive. Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then – like the related yet independent tasks performed in modern production techniques to ensure good results – some play for the operation of both §363(b) and Chapter 11 must be allowed for.

> The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application. In this case the only reason advanced for granting the request to sell Lionel's 82 percent stock interest in Dale was the Creditors' Committee's insistence on it. Such is insufficient as a matter of fact because it is not a sound business reason and insufficient as a matter of law because it ignores the equity interests required to be weighed and considered under Chapter 11. The court also expressed its concern that a present failure to approve the sale would result in a long delay. As the Supreme Court has noted, it is easy to sympathize with the desire of a bankruptcy court to expedite bankruptcy reorganization proceedings for they are frequently protracted. "The need for expedition, however, is not a justification for abandoning proper standards." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 450, 88 S.Ct. 1157, 1176, 20 L.Ed.2d 1 (1968). Thus, the approval of the sale of Lionel's 82 percent interest in Dale was an abuse of the trial court's discretion.
>
> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Id.* at 1070-71.

Judge Steen explains the development of the jurisprudence of chapter 11 §363(b) sales in the Fifth Circuit in *In re Gulf Coast Oil Corp.* The discussion generally reflects the development of the

law throughout the United States. He concludes that under the existing jurisprudence in the Fifth Circuit:

- The debtor in possession or trustee in a chapter 11 case must consider its fiduciary duties to all creditors and interest holders before seeking approval of a transaction under §363(b).
- The movant must establish a business justification for the transaction and the bankruptcy court must conclude, from the evidence, that the movant satisfied its fiduciary obligations and established a valid business justification.
- A sale, use, or lease of property under §363(b) is not *per se* prohibited even though it purports to sell all, or virtually all, of the property of the estate, but such sales (or proposed sales of the crown jewel assets of the estate) are subject to special scrutiny.
- Parties that oppose §363(b) transactions on the basis that they constitute a *sub rosa* chapter 11 plan must articulate the specific rights that they contend are denied by the transaction.
- Although the bankruptcy court need not turn every §363(b) hearing into a mini-confirmation hearing, the bankruptcy court must not authorize a §363(b) transaction if the transaction would effectively evade the "carefully crafted scheme" of the chapter 11 plan confirmation process, such as by denying §§1125, 1126, 1129(a)(7), and 1129(b)(2) rights.
- If the bankruptcy court concludes that such rights are denied, then the bankruptcy court can only approve the transaction if it fashions an appropriate protective measure modeled on those which would attend a reorganization plan.
- Transactions that explicitly release all (or virtually all) claims against the estate, predetermine the structure of a plan of reorganization, and explicitly obligate parties to vote for or against a plan are not authorized under § 363(b)

*Id.* at 422.

Judge Steen suggests a number of factors to consider when a §363 motion is brought before the court. He identifies and discusses nine areas of concern presenting them as questions and discussion. The nine areas of concern provide a solid foundation to analyze §363 sales. They are, without the discussion which is itself very helpful:

1. Is there evidence of a need for speed?
2. What is the business justification?
3. Is the case sufficiently mature to assure due process?
4. Is the proposed APA sufficiently straightforward to facilitate competitive bids or is the purchaser the only potential interested party?
5. Have the assets been aggressively marketed in an active market?
6. Are the fiduciaries that control the debtor truly disinterested?
7. Does the proposed sale include all of a debtor's assets and does it include the "crown jewel"?
8. What extraordinary protections does the purchaser want?
9. How burdensome would it be to propose the sale as part of confirmation of a chapter 11 plan?

*Id.* at 423-424.

The court considered these and other factors in approving the proposed sale in this case, but required certain provisions to be excised. The excised provisions all furthered a *sub rosa* plan of reorganization. None, especially the proposed unsecured creditors trust, had a good business reason.

The releases for the three key employees were removed. Integreon asserted that it did not want its newly acquired employees to be burdened by claims that could be made by the debtor. It would distract them from their new jobs at Integreon. The difficulty was that no one was able to articulate what the threatened claims were, the likelihood that the debtor would prevail or what they were worth. Moreover, Integreon agreed to carve-out up to $30,000 for tail directors and officers liability insurance. The relation or availability of the insurance to the hypothetical claims and the

11

effect of releasing them was not explored.[6] The absence of this information suggests that a sound business reason had not been formulated. Such provisions are more appropriately sought in the context of a chapter 11 plan confirmation where the issues can be fully explored, evaluated and measured against the confirmation requirements.

The payment to the proposed general unsecured creditors trust was removed. This provision was inserted at the insistence of the Unsecured Creditors Committee. The debtor presented itself as uninterested in the outcome of this provision. Integreon was unaffected by it. It agreed to pay the money to either the debtor or the proposed general unsecured creditors trust. The modification to the debtor's sale agreement provided:

> Integreon and the Committee recognize that the creation of such a separate trust remains subject to approval by the Bankruptcy Court. If the Court does not approve the establishment of such a trust, it is understood and agreed that Integreon will not be expected or required to provide any further consideration for the sale and that the sale shall go forward with all the assets provided for herein being received by the On-Site Estate including, without limitation the Collateral Carve-Out.

Notice of Material Changes to Terms of Asset Purchase Agreement, Exhibit A at 3. (Docket Entry 251). While the language was at first somewhat confusing to the court, Integreon stated at the hearing that the language meant that it would pay the $132,000 in any event, but no more.

The Unsecured Creditors Committee argues that the intended payment to the general unsecured creditors trust is really a distribution of Integreon's property and Integreon can do anything it likes with its property. In fact, the proceeds from the sale of property of the estate are property of the estate. Bankruptcy Code §541. This is not changed by the fact that the property sold

---

[6]There is no provision for issuing injunctions in §363. Injunctions may be available in the context of a §363 sale, but must be obtained by commencing an adversary proceeding. Fed.R.Bankr.P. 7001(7). They may be available as a part of a chapter 11 plan. *See* Bankruptcy Code §524(g). The extent of the release sought by Integreon, for example, to prevent creditors as opposed to the debtor from bringing actions against the three key employees, may implement Rule 7001(7).

is subject to an encumbrance. That just means that the proceeds are also subject to an encumbrance. The proceeds nonetheless remain property of the estate. They are subject to the jurisdiction of the court. Moreover, the Committee's argument is vitiated by the facts of this case. In this case, upon consummation of the sale Integreon released its lien on the remaining property of the estate and forgave its deficiency. The money paid by Integreon remained property of the estate as proceeds from the sale of property of the estate, but free and clear of Integreon's lien which it released and which was extinguished by the satisfaction of the indebtedness to it by forgiveness.

The Committee further argues, quite disingenuously, that the payment is a gift from Integreon to the general unsecured creditors. It more aptly describes the circumstances of the "gift" elsewhere in its reply to the United States Trustee's objection to the modified terms:

> 41. . . . The resolution of all disputes as between the Committee and Integreon with respect to the sale process was critical to the Sale Motion going forward unopposed, paving the way for Integreon and the Debtors to consummate the sale within the expedited time frame desired by the parties as vital to preserve the value of the assets of the estate to be sold.
>
> 42. In the event that the Sale Motion was opposed by the Committee, and the Committee was successful with its objections, the Closing could have been seriously delayed, resulting in a substantial decline in value of Integreon's collateral. Clearly, the Collateral Carve-Out is not only in exchange for the release/waiver of "estate" causes of action, but also for the removal of the only serious impediment to the Debtors and Integreon effectuating a quick sale that, as originally proposed, would have provided little, if any, benefit to any party other than Integreon. Under these circumstances, the Committee's agreement to support the Sale Motion constitutes substantial consideration given by the Committee, not on behalf of the estates or the Debtors, in exchange for the Collateral Carve-Out.

The Official Committee of Unsecured Creditors' Reply to the Objection of the United States Trustee to Certain Changes Set Forth in the Notice Of Material Changes to Terms of Asset Purchase Agreement at ¶¶41-42. (Committee's Reply) (Docket Entry 292).

There is a greater problem with the general unsecured creditors trust: the effect on the chapter 11 process. The provision effectively predetermines, in significant part, the structure of an as yet to be drafted plan of reorganization and effectively evades the "carefully crafted scheme" of the chapter 11 plan confirmation process. *In re Gulf Coast Oil Corp.,* 404 B.R. at 422 (quoting *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir. 1983)).

The general unsecured creditors trust provision is contrary to the scheme of distribution envisioned in both a chapter 7 and chapter 11 liquidation. It would assure that the general unsecured creditors are paid in advance of the administrative and priority claims. At oral argument, the Committee's counsel candidly admitted that the purpose was to assure that the general unsecured creditors received a distribution. He admitted that if there were insufficient funds to pay all administrative expenses and priority claims, some administrative or priority claimants would go unpaid while the unsecured creditors received a distribution. The chapter 7 liquidation scheme is a matter of consideration because conversion of this case to chapter 7 and payment of creditors under §726 is likely. Moreover, the chapter 7 liquidation scheme provides a comparison against which this chapter 11 liquidation plan may be compared.

The total amount that Integreon is paying the debtor for its assets represents the fair value of the assets purchased on the day they were purchased. Fair market value of an asset is the value at which a willing buyer is willing to pay and a willing seller is willing to sell where neither the purchaser nor the seller are under any compulsion to buy or to sell. Here, both Integreon and the debtor are under pressure. The debtor cannot continue in business without outside financial support and Integreon desires a prompt conclusion to the sale, it having already effectively expended the

purchase price in buying the bank's notes. But, it does represent the fair value at the time. The debtor had marketed itself and had no other offers. The Unsecured Creditors Committee agreed to the sale, which includes the total price to be paid although it was to receive special consideration. Had it thought that the price was inadequate, it would not have consented to the sale. The court was satisfied as to the price, the price being the total amount being paid by Integreon which includes the $132,000 and other consideration proposed to be earmarked for the general unsecured creditors trust.

In the ordinary course of a chapter 11 case, the $132,000 and other consideration proposed to be earmarked for the general unsecured creditors trust would be part of the fund to be distributed to creditors of the estate. That distribution would be determined in a confirmed chapter 11 plan. A chapter 11 plan cannot be confirmed unless it complies with §1129(a), or if all of the provisions of §1129(a) are satisfied except §1129(a)(8) then also with §1129(b). Two provisions, other than §1129(a)(8) would most likely be violated by the proposed general unsecured creditors trust. Priority claimants are adversely affected. Section 1129(a)(7) requires that an impaired class of claims accept the plan or receive as much as they would receive under a distribution under chapter 7. Absent consent, this is not satisfied if the general unsecured creditors receive a distribution before the priority claims are paid in full. In addition, §1129(a)(9) requires that all administrative claims be paid in full unless the holder of a particular claim has agreed to a different treatment. The consideration earmarked for the general unsecured creditors trust effectively evades this requirement by redirecting part of the purchase price from the administrative expense claimants to general unsecured creditors without the consent of the holders of the administrative claims.

It is true that consent to a chapter 11 plan could overcome the confirmation requirements of §§1129(a)(7) and (a)(9). Consent invokes the chapter 11 provisions relating to the preparation,

15

approval and circulation of a disclosure statement. The disclosure statement is the mechanism by which creditors make informed choices on a proposed chapter 11 plan. This case has not progressed to the disclosure statement point, yet. Without consent, it does not appear that §1129(b) would enable the court to confirm a plan containing the proposed general unsecured creditors trust. Moreover, the sale process was quick. The applicable terms were not filed with the court until April 9, 2009. The hearing approving the sale was held on April 28, 2009. It is not clear that the adversely affected parties had meaningful notice, if they received any notice of the proposed general unsecured creditors trust. Only the United States Trustee appeared and challenged the provision.

The end result of the proposed consideration for the general unsecured creditors trust would have been to divert a part of the proceeds of the sale of the debtor's assets to the general unsecured creditors to the detriment of administrative expense and priority creditors and thereby allow the general unsecured creditors to avoid some of the vicissitudes of the chapter 11 process or a conversion to chapter 7. All of this violates the protections chapter 11 seeks to provide for creditors, particularly administrative expense and priority creditors. They are effectively deprived of their rights under §1129(a)(7) and (a)(9), their right to adequate information to make an informed decision on a proposed chapter 11 plan under §1125, and their right to object to a proposed chapter 11 plan under §1126.

There is another aspect that is troubling. Integreon paid the $132,000 as additional consideration so that it could obtain quick approval of the sale. The Committee stated as much. *See* Committee's Reply at ¶42. There is nothing wrong with the Committee or any individual creditor examining a proposed transaction to determine whether it is fair and reasonable. Nor is there anything wrong in the Committee or any individual creditor objecting to a proposed transaction that

16

is not fair or reasonable. Chapter 11 is a community action. It is hoped that through the analysis and action of the creditor body both collectively and individually that the best result for the most creditors within the confines of the Bankruptcy Code will be achieved. However, it is unfair to successfully increase an inadequate sales price to a fair sales price, but then keep that benefit for one's own constituency at the expense of other more senior classes of creditors. It is unfair to other creditors adversely affected. It is unfair to prospective purchasers. Prospective purchasers should defend their offers on the merits. The sale should benefit the estate. They should not be put in the position of succumbing to creditors seeking individual advantage. The court should not facilitate or encourage this type of action. It may discourage prospective purchases or cause them to underbid in the expectation that there will be objections that have to be resolved on an individual basis. This distorts the chapter 11 process.

The final consideration is the weight to be placed on the debtor's business judgment. The court returns to *In re Gulf Coast Oil Corp*. It discussed this matter.

> 6.  Are the fiduciaries that control the debtor truly disinterested?
>
> As the Fifth Circuit discussed, a debtor-in-possession must exercise fiduciary duty in determining whether and how to propose a sale of assets. If entities that control the debtor will benefit, or will potentially benefit, from the sale the court must carefully consider whether it is also appropriate to defer to their business judgment.

*In re Gulf Coast Oil Corp.,* 404 B.R. at 424.

In determining the weight to put on the debtor's business judgment in this case, the court recognizes the difficult positions in which the debtor was placed. The first was with the Committee. While the debtor benefitted from the Committee's success in having Integreon forgive its potentially huge deficiency claim, it opposed the Committee's request for a Rule 2004 examination of Integreon.

17

In addition, the proposed consideration to the general unsecured creditors trust shows the not unusual situation where the debtor has a lot at stake and the particular controversy is relatively insignificant. The debtor was, as have been many other chapter 11 debtors, caught in the crossfire.

The debtor was in a difficult position when Integreon requested releases for the three key employees. The matter is somewhat clouded. It is not clear what role the three key employees played in the management of the debtor, the Integreon negotiations or the direction of the chapter 11 case. It is not clear what claims against the employees might have existed or the value of the claims. This situation is an uncomfortable one for a debtor-in-possession.

The general unsecured creditors trust provision illustrates another uncomfortable position for the debtor. The entire sale, worth over $28 million was placed in risk, and at least faced delay, over the additional consideration to the general unsecured creditors trust of $132,000 and other assets. No sound business reason was articulated by the debtor for the general unsecured creditors trust. Even the Unsecured Creditors Committee does not offer one other than it permitted the resolution of "all disputes as between the Committee and Integreon with respect to the sale process [which were] critical to the Sale Motion going forward unopposed, paving the way for Integreon and the Debtors to consummate the sale within the expedited time frame desired by the parties as vital to preserve the value of the assets of the estate to be sold." Committee's Reply at ¶41. This is a spoiler's argument.[7] The debtor faced the prospect of losing the sale over a relatively small amount, possibly one or two percent of the total deal.

---

[7] The sale as originally proposed, "provided little, if any, benefit to any party other than Integreon." Committee's Reply at ¶42.

Given the difficult positions in which the debtor found itself, the court cannot give much deference to the debtor's business judgment as applied to these additional provisions. The two provisions are not supported by legitimate business reasons.[8] They do not advance the debtor's chapter 11 efforts. They distort the chapter 11 process. They compromise the debtor's fiduciary duties which run to all creditors, not simply a portion of the creditors. It is difficult to imagine any business reason furthered by the proposed general unsecured creditors trust other than appeasement of "the hue and cry of the most vocal special interest groups." *In re Lionel Corp.,* 722 F.2d at 1071.

The court is satisfied that the overall sale was in the best interests of the debtor and that the debtor exercised its sound business judgment in proposing the sale. However, the court cannot give any significant weight to the debtor's business judgment as exercised by the inclusion of the general unsecured creditors trust or the release of the three key employees. The remedy was, with the consent of the debtor, Integreon and the Unsecured Creditors Committee, to excise these provisions and approve the sale without them.

## **Conclusion**

The §363(b) sale of substantially all of the assets of the debtor to Integreon was approved by the court despite the fact that it was for all practical purposes the predetermined purchaser. The debtor's pre-petition sales efforts and the absence of money in the credit market satisfied the court that this was the best deal – and the only one – available. Integreon came into the court with an

---

[8] There is a certain amount of pragmatism in caving in to a spoiler's arguments, particularly where the additional cost of the sale in relation to the potential benefit of the sale is relatively small. Pragmatism, though, does not convert a spoiler's argument into a legitimate business reason. The Unsecured Creditors Committee never developed its objections before the court. Whatever those objections might have been, the court cannot see why they would be unique to the general unsecured creditors. At best, they concerned the sales process or the sales price, matters of concern to all creditors and parties in interest.

exceptionally strong position as the sole pre-petition secured creditor with a significant undersecured claim. It sought additional leverage in the DIP Financing Motion. Much of the requested relief in the DIP Financing Motion, such as the roll-up of the pre-petition debt into a single post-petition debt was denied. The excesses in the Sales Motion were eliminated, such as the unnecessary break-up fee. The Unsecured Creditors Committee was successful in obtaining a major concession, the forgiveness of any deficiency claim. Whether this will be worth anything is unknown at this time, but without the concession, the unsecured creditors' claims would have been significantly diluted by Integreon's huge unsecured deficiency claim.

The principal relief denied was the Unsecured Creditors Committee's provision for a general unsecured creditors trust. That was excised from the sale for the reasons set out above.

Alexandria, Virginia
June 22, 2009

/s/Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Jeremy S. Williams
Jonathan L. Gold
Martha Davis

15205